IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-11-00071-CV

 

Doris Dickerson Individually

& as Representative of The Estate

of Jerry Dickerson & Longhorn Pest Control,

                                                                                    Appellants

 v.

 

State Farm Lloyd's Inc. d/b/a 

State Farm Mutual Automobile 

Insurance Company and/or d/b/a 

State Farm and Laura CAmpos,

                                                                                    Appellees

 

 

 



From the 220th District
Court

Hamilton County, Texas

Trial Court No. CV02308

 



MEMORANDUM  Opinion



 

Appellants,
Doris Dickerson, individually and as representative of the estate of Jerry
Dickerson, and Longhorn Pest Control, challenge the trial court’s granting of
summary judgment and several other orders in favor of appellee, Laura Campos.[1] 
By four issues, appellants argue that the trial court erred in:  (1) granting
Laura’s no-evidence motion for summary judgment; (2) sustaining Laura’s
objections to appellants’ summary judgment evidence of proximate cause; (3)
granting Laura’s motion to sever; and (4) denying appellants’ motions to limit
the testimony of Laura and her husband, Miguel Campos.  We affirm.

I.      
Background

 

This lawsuit
arises out of a motor vehicle accident that occurred near Hico, Texas, on
February 19, 2006.  The accident involved a Toyota Tacoma pickup truck driven
by the decedent, Jerry Dickerson, and two other vehicles, a Kia Sorrento driven
by Jennifer Green and a Lexus ES300 sedan driven by Laura.[2] 
The facts regarding how the accident took place are disputed.

It is undisputed
that, on February 19, 2006, Jerry, a sixty-nine year old, was traveling
southbound on Highway 281 and lost control of his pickup truck on an icy
surface on the Bosque River bridge.[3] 
Based on his investigation, Texas Department of Public Safety Trooper Erich
Neumann concluded that Jerry lost control of his pickup truck because he was
driving at an unsafe speed with regard to the road conditions, a fact that even
appellants’ accident reconstructionist Cam Cope admitted.  After losing control
of his pickup truck, it was alleged that Jerry struck the high curb of the
bridge and then Green’s Kia that was traveling in the oncoming lane.  Laura
asserts on appeal that although “no passenger in the Kia needed medical
attention” and the “damage rating to the Kia was lower than the other
vehicles,” the record contains evidence that the Kia sustained major damage, a
claim that appellants dispute.  Nevertheless, after striking the Kia, Jerry’s
pickup truck began to spin.  The pickup truck allegedly collided with the high
curb of the bridge at least one more time, possibly several times, and the rear
axle of the pickup truck became dislodged.  After striking the high curb of the
bridge once more, the pickup truck began sliding sideways southbound down the
bridge “with considerable force.”

Laura was
driving her Lexus sedan northbound on Highway 281 at the time this incident transpired.[4] 
Laura alleges on appeal that she was driving right behind Green’s Kia when the
incident began.  Upon seeing the collision between Jerry’s pickup truck and the
Kia, Laura states that she slowed down and moved toward the center of the
bridge in an attempt to avoid colliding with either of the vehicles.  However,
Laura was unable to avoid colliding with Jerry’s pickup truck, which was now
careening down the bridge sideways.  The side of Jerry’s pickup truck collided
with the front of Laura’s sedan.  Neither Laura nor her husband, a front-seat
passenger at the time, sustained serious injuries.

Jerry, however,
died at the scene of the accident.  The actual cause of Jerry’s death was hotly
contested in the trial court.  On February 14, 2008, appellants filed their
original petition asserting wrongful death and survival claims against Laura
and seeking monetary compensation for the death of Jerry.  Appellants alleged
that Laura was negligent in failing to:  (1) “yield right of way to [Jerry]”;
(2) “come to a stop before impacting the decedent’s vehicle”; (3) “keep in a
single northbound lane”; and (4) “take proper advance evasive action prior to
impact.”  Subsequently, appellants amended their original petition to assert
claims against Jerry’s uninsured/underinsured motorist carrier, State Farm
Lloyd’s, Inc. d/b/a State Farm Mutual Automobile Insurance Company (“State
Farm”).[5]

In support of
their allegations against Laura and State Farm, appellants proffered three
expert witnesses—Cope, Al Davies, M.D., and Emergency Medical Technician
(“EMT”) Steven Edgar.  Cope testified via deposition that Laura failed to stop
or reduce her speed upon seeing Jerry collide with the Kia.  He also opined
that, based on his calculations, Laura was speeding given the road conditions
and that she failed to take evasive action to reduce or eliminate the risk of
colliding with Jerry’s pickup truck.  Cope estimated that, at the point of
impact, Jerry’s pickup truck was “at rest or nearly at rest” and that Laura was
traveling between forty-five and fifty-five miles per hour.

Dr. Davies
recounted that Jerry’s death certificate indicated that he died as a result of
blunt-force trauma sustained during the accident.  Dr. Davies opined that
Jerry’s collision with Laura was far more injurious than the collision between
Jerry’s pickup truck and the Kia.  Dr. Davies also testified that Jerry likely
had a skull fracture, a neck or spinal injury, and lung, esophageal, or aortic
injuries as a result of the accident.  Dr. Davies admitted that any one of
these injuries could have caused Jerry’s death; however, it was Dr. Davies’s
opinion that Jerry died of exsanguinations or “bleeding out” from one of his
thoracic injuries.  Dr. Davies was unable to rule out the possibility that
Jerry’s internal bleeding could have been caused by the initial collision with
the Kia.

Edgar, the EMT
that treated Jerry at the scene of the accident, stated that it was his belief,
within a reasonable medical probability, that Jerry’s collision with Laura’s
sedan was more severe than any other impact involved in the accident and that
Jerry’s collision with Laura’s sedan was the impact that caused his death.

            Subsequently, Laura filed a
no-evidence motion for summary judgment, contending that there was no evidence
that her alleged acts proximately caused Jerry’s death or any of the damages
associated with the accident.  Without a hearing, Judge James Morgan, granted
Laura’s no-evidence motion for summary judgment.  In his letter ruling, Judge
Morgan stated that the deposition testimony of appellants’ expert witnesses
failed to establish causation and, thus, prevented appellants’ expert witnesses
from testifying as to causation.

            Appellants filed a motion
for reconsideration, which Judge Morgan eventually granted.  Thereafter, several
motions were filed by both parties.  Laura filed a motion to strike the
testimony of Cope.  State Farm moved to strike the testimony of Dr. Davies and
Edgar, arguing that their causation testimony did not meet the standards set
forth in Daubert and its progeny, see generally Daubert v. Merrell
Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993);
Laura adopted this motion.  Laura filed a motion to sever appellants’ claims
against her from those against State Farm, and she filed another no-evidence
motion for summary judgment.  And finally, appellants moved to limit the trial
testimony of Laura and her husband for “belatedly turning in their deposition
errata sheets.”  All of these motions were presented to Judge Morgan’s successor,
Judge Phil Robertson.

            After reviewing the
documents contained in the file, Judge Robertson:  (1) granted the motions to
strike the opinions of Edgar, Dr. Davies, and Cope; (2) granted Laura’s motion
to sever; (3) denied appellants’ motion to limit the testimony of Laura and her
husband; and (4) granted Laura’s re-urged no-evidence motion for summary judgment. 
This appeal followed.

II.   
Appellee’s Objections to Appellants’ Summary Judgment Evidence

 

By their second issue, appellants argue
that the trial court abused its discretion in striking the testimony of their
experts, Dr. Davies, Edgar, and Cope.  We disagree.

A.   
Standard of
Review and Applicable Law

 

The trial court
serves as an evidentiary gatekeeper by screening out irrelevant and unreliable
expert evidence, and it has broad discretion to determine the admissibility of
such evidence.  See Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 590
(Tex. 1999); Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713,
718-19 (Tex. 1998); see also E.I. du Pont de Nemours & Co. v. Robinson,
923 S.W.2d 549, 558 (Tex. 1995).  The test for abuse of discretion is whether
the trial court acted without reference to any guiding rules or principles such
that the ruling was arbitrary or unreasonable.  Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).  A reviewing court cannot
conclude that a trial court abused its discretion simply because the reviewing
court would have ruled differently.  See Loftin v. Martin, 776 S.W.2d
145, 146 (Tex. 1989).

            The Texas Rules of Evidence
provide that:  “If scientific, technical, or other specialized knowledge will
assist the trier of fact to understand the evidence or to determine a fact in
issue, a witness qualified as an expert by knowledge, skill, experience, training,
or education, may testify thereto in the form of opinion or otherwise.”  Tex. R. Evid. 702.  To establish a
witness’s expert qualifications, the party calling the witness must show “that
the expert has ‘knowledge, skill, experience, training, or education’ regarding
the specific issue before the court which would qualify the expert to give an
opinion on that particular subject.”  Roberts v. Williamson, 111 S.W.3d
113, 121 (Tex. 2003) (quoting Broders v. Heise, 924 S.W.2d 148, 153
(Tex. 1996)); see Gammill, 972 S.W.2d at 718.  Whether a witness is
qualified to offer expert testimony is a matter committed to the trial court’s
discretion.  Broders, 924 S.W.2d at 151; see also Gammill, 972
S.W.2d at 718-19.

            Essentially, a two-part test
governs whether expert testimony is admissible:  (1) the expert must be
qualified; and (2) the testimony must be relevant and based on a reliable
foundation.  Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.
2001); see Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 800
(Tex. 2006).  “Admission of expert testimony that does not meet the reliability
requirement is an abuse of discretion.”  Mendez, 204 S.W.3d at 800. 
Expert testimony is unreliable if it is based on unreliable data, or if the
expert draws conclusions from his underlying data “based on flawed
methodology.”  Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714
(Tex. 1997).  Expert testimony is also unreliable if “’there is simply too
great an analytical gap between the data and the opinion proffered.’”  Gammill,
972 S.W.2d at 726 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146,
118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997)).

            In E.I. du Pont de
Nemours & Co. v. Robinson, the Texas Supreme Court set out six factors
that courts may consider in deciding whether expert testimony is reliable:

(1)  
the extent to which
the theory has been or can be tested;

 

(2)  
the extent to which
the technique relies on the subjective interpretation of the expert;

 

(3)  
whether the theory
has been subjected to peer review and/or publication;

 

(4)  
the technique’s
potential rate of error;

 

(5)  
whether the
underlying theory or technique generally has been accepted as valid by the
relevant scientific community; and

 

(6)  
the nonjudicial uses
which have been made of the theory or technique.

 

923 S.W.2d at 557.  These Robinson
factors are non-exclusive, see Mendez, 204 S.W.3d at 801, and “are not
always useful in evaluating expert testimony.”  Id. at 802.  When the Robinson
factors do not readily lend themselves to a review of the expert testimony,
“there must be some basis for the opinion offered to show its reliability.”  Gammill,
972 S.W.2d at 726; see Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 39
(Tex. 2007) (recognizing that the Robinson factors do not always readily
lend themselves to a review of expert testimony in automobile-accident cases); Mendez,
204 S.W.3d at 802.  An expert’s “bare opinion” will not suffice and is
unreliable if “based solely upon his subjective interpretation of the facts.”  Volkswagen
of Am., Inc. v. Ramirez, 159 S.W.3d 897, 906 (Tex. 2004).  In
automobile-accident cases, the supreme court has found it appropriate to
analyze whether the expert’s opinion actually fits the facts of the case,
ostensibly adopting the “analytical gap” test for automobile-accident cases.  TXI
Transp. Co. v. Hughes, 306 S.W.3d 230, 235, 239 (Tex. 2010); see City of
San Antonio v. Pollock, 284 S.W.3d 809, 818 (Tex. 2009) (“’[A] claim will
not stand or fall on the mere ipse dixit of a credentialed witness.’”)
(quoting Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999) (emphasis in
original)).

            In addition, the general
rule has long been that expert testimony is necessary to establish causation as
to medical conditions outside the common knowledge and experience of jurors.  See
Guevara v. Ferrer, 247 S.W.3d 662, 668 (Tex. 2007) (explaining that
“non-expert evidence alone is sufficient to support a finding of causation in
limited circumstances where both the occurrence and conditions complained of
are such that the general experience and common sense of laypersons are
sufficient to evaluate the conditions and whether they were probably caused by
the occurrence”); Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982)
(holding that “the diagnosis of skull fractures is not within the experience of
the ordinary layman” and therefore required expert testimony); Ins Co. of N.
Am. v. Myers, 411 S.W.2d 710, 713 (Tex. 1966) (holding that an “inference
that a pre-existing tumor was activated and the deadly effects of a malignancy
accelerated by an injury” was a “question of science determinable only from the
testimony of expert medical professionals”); see also Kaster v. Woodson,
123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref’d) (“What is an
infection and from whence did it come are matters determinable only by medical
experts.”).  However, in some circumstances, Texas courts have recognized an
exception to this general rule—that causation findings linking events and
physical conditions could be sufficiently supported by non-expert evidence.  See
Parker v. Employers Mut. Liab. Ins. Co. of Wis., 440 S.W.2d 43, 46 (Tex.
1969).

B.     Dr. Davies

In his letter ruling on State Farm and
Laura’s motion to strike Dr. Davies’s testimony, Judge Robertson stated the
following:

The Motion is granted.  The data available for Dr. Davies
to form an opinion is very limited.  He is unable to rule out or rule in
alternative causes of Mr. Dickerson’s injuries and death.  The scientific
articles on which he relies for confirmation of his opinions were not
themselves peer reviewed.  The Plaintiffs have failed to establish that Dr.
Davies’[s] opinions would rise above mere speculation so as to offer genuine
assistance to the jury.

 

In his deposition, Dr. Davies testified
that, in 2004, he formed an independent practice of critical care medicine,
which involves “[t]aking care of people who are at risk of death through some
imminent means such as a heart attack, breathing failure, kidney failure,
bleeding, [or] trauma.”  With regard to his credentials, Dr. Davies stated that
he received his medical degree from the University of Utah medical school; that
he has been licensed to practice medicine in Texas since 1984; and that he is
board certified in internal medicine and endocrinology.  However, he denied
having any experience in accident reconstruction or having any engineering or
biomechanical licenses or degrees.  Dr. Davies testified that he took some
physics courses in college while obtaining a degree in chemistry and
thermodynamics.  He acknowledged that it is “more appropriate to have an
accident reconstructionist make those calculations” of the specific forces
exerted upon vehicle occupants in automobile accidents.  Nevertheless, Dr.
Davies opined that Jerry died of exsanguinations and that the collision with
Laura’s sedan was the cause of Jerry’s death.  Dr. Davies made these
conclusions without ever physically examining Jerry, conducting an autopsy, or
reviewing any of Jerry’s medical records that may have been available. 
Instead, Dr. Davies relied exclusively upon the EMS report drafted by Edgar, which
noted that Jerry had heavy bleeding from his nose and mouth, and the death
certificate, which generally stated that Jerry died from blunt force trauma
sustained during the accident, drafted and signed by the local Justice of the
Peace.

Later in his deposition testimony, Dr.
Davies admitted that he could not rule out that Jerry sustained internal
bleeding as a result of impacts with the Kia or with the bridge.  In addition,
Dr. Davies acknowledged that Jerry also sustained a head injury, which was
described as a skull fracture.  Dr. Davies stated that he could not rule out
the possibility that Jerry’s head injury caused his death and that the head
injury could have been caused by the impact with the Kia.  Dr. Davies later
made the following conclusory statements about Jerry’s additional injuries:  

Well, he was bleeding from both his
esophagus and his trachea in large amounts.  So, and again it occurred in a
context of a T-bone kind of collision.  So, a major disruption of organs, like
a transection of the esophagus, a rupture of the aorta, a rupture of the
trachea or some combination of something of that nature is a probably [sic]
explanation.  He probably had—he had to have more than one because if, for
example, he simply transected his trachea, he wouldn’t be having so much blood
coming out of the esophagus.

 

Dr. Davies also testified that Jerry
sustained a neck and spine injury and admitted that he could not rule out any
of the above-mentioned injuries as the cause of Jerry’s death.  Moreover, Dr.
Davies stated that he could not determine with reasonable medical certainty at
what time during the accident the potentially fatal neck and back injury would
have occurred.  Dr. Davies was also unable to rule out the possibility that
“other disease process[es]” could have contributed to Jerry’s death.

            It is well-established that
an expert witness’s failure to rule out alternative causes of an incident may
render his opinion unreliable.  See Transcon. Ins. Co. v. Crump,
330 S.W.3d 211, 217-218 (Tex. 2010) (“’An expert’s failure to rule out
alternative causes of an incident may render his opinion unreliable.’”)
(quoting Hughes, 306 S.W.3d at 237); Robinson, 923 S.W.2d at 559
(“An expert who is trying to find a cause of something should carefully
consider alternative causes. . . .  Dr. Whitcomb’s failure to rule out other
causes of the damage renders his opinion little more than speculation.”)
(citation omitted).  However, the Crump court further noted that a
medical causation expert need not “’disprov[e] or discredit[] every possible
cause other than the one espoused by him.’”  330 S.W.3d at 218 (quoting Viterbo
v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987)).  If that were the
case, then few expert opinions would be considered reliable.  Id. 
Nevertheless, “if evidence presents ‘other plausible causes of the injury or
condition that could be negated, the [proponent of the testimony] must
offer evidence excluding those causes with reasonable certainty.’”  Id.
(quoting Havner, 953 S.W.2d at 720) (emphasis in original); see
Robinson, 923 S.W.2d at 558-59 (concluding that the trial court did not
abuse its discretion by excluding testimony by an expert who “conducted no
testing to exclude other possible causes . . . even though he admitted in his
deposition that many of the symptoms could be caused by” other specific
conditions).

Here, no autopsy
of Jerry’s body was conducted, nor did anyone review Jerry’s medical records. 
Dr. Davies testified that an autopsy of Jerry’s body could have been helpful in
determining the extent of his injuries.  In addition, Dr. Davies was unable to
rule out several potential causes of Jerry’s death or when those potential
causes occurred, though Dr. Davies admitted that his review of the EMS report
revealed that Jerry sustained numerous potentially fatal injuries as a result
of the incident.  In spite of this, Dr. Davies still opined that Jerry died of
exsanguinations as a result of his collision with Laura.  These statements
amount to no more than speculation as to the cause of Jerry’s death.  Because
Dr. Davies was unable to rule out other plausible causes of Jerry’s death that
were raised by the evidence and because an autopsy was not conducted and Dr.
Davies did not review Jerry’s medical records when either could have been
useful to rule out other plausible causes of Jerry’s death, we cannot say that
the trial court erred when it determined that Dr. Davies’s testimony is not
reliable or would not be helpful to the jury.  See Crump, 330
S.W.3d at 218; Hughes, 306 S.W.3d at 237; Ramirez, 159 S.W.3d at
906; see also Havner, 953 S.W.2d at 720; Robinson, 923
S.W.2d at 558-59.

Furthermore, Dr.
Davies testified that the impact between Jerry’s pickup truck and Laura’s sedan
was a “T-bone” and that the injuries that caused Jerry’s death could have only
been caused by such an impact.  Dr. Davies made these statements without any
experience in accident reconstruction.  In fact, Dr. Davies admits that he is
unqualified to testify as to how the accident occurred; he also states that he
has no personal knowledge as to how the accident occurred and that he did not
try to determine the speed of the vehicles or how hard each of the impacts
were.  Rather, Dr. Davies relied on articles, many of which were not peer
reviewed, that state that more serious injuries occur from “T-bone” impacts
than from “side-side” impacts.  These articles were not included in the summary
judgment record, and based on Dr. Davies’s comments, these articles do not
appear to be a reliable foundation upon which he could rely in producing his
opinion.  Based on his own statements, we conclude that accident reconstruction
is not within Dr. Davies’s “‘knowledge, skill, experience, training, or
education.’”  Roberts, 111 S.W.3d at 121 (quoting Broders, 924
S.W.2d at 153).  Furthermore, we cannot say that the reconstruction of the
accident, the determination of the impacts on the vehicles and the vehicles’
occupants, and the determination of which impact caused Jerry’s death is within
the “general experience and common sense of laypersons . . . to evaluate the
conditions and whether they were probably caused by the occurrence.”  Guevara,
247 S.W.3d at 668; see Roark, 633 S.W.2d at 809; Myers, 411
S.W.2d at 713; see also Woodson, 123 S.W.2d at 983.  As such, we
conclude that the trial court did not err in concluding that Dr. Davies was not
qualified to opine on how the accident occurred and which impact caused Jerry’s
death.  See Guevara, 247 S.W.3d at 668; Roberts, 111 S.W.3d at
121; Broders, 924 S.W.2d at 153; Roark, 633 S.W.2d at 809; Myers,
411 S.W.2d at 713; see also Woodson, 123 S.W.2d at 983.  Therefore,
based on the foregoing, we cannot say that the trial court abused its
discretion in striking Dr. Davies’s testimony.  See Sanchez, 997 S.W.2d
at 590; Gammill, 972 S.W.2d at 718-19; see also Robinson, 923
S.W.2d at 558.

C.    Edgar

With respect to Edgar’s
testimony, Judge Robertson noted that:

 

The Motion is granted.  Steven Edgar is
not qualified to render an expert opinion regarding Mr. Dickerson’s cause of
injuries or death.  There is no factual or scientific basis for his conclusions
regarding the severity of the impacts, nor the specific causes of Mr.
Dickerson’s injuries or death.  Mr. Edgar may testify as to what he saw [at]
the scene of the collisions and what he did as a first responder, but any
expert opinions concerning cause of injuries or death, and the severity of the
collisions is excluded. 

 

            Edgar testified that, in his
experience as an EMT and with the local fire department, he investigated many
automobile accidents, including several that involved serious injuries or
death.  Edgar stated that he had investigated such accidents for “seven or
eight years now.”  Edgar then described the scene of the accident when he
arrived.  At the time of Edgar’s arrival, Jerry was trapped inside his pickup
truck and was not breathing, though he did have a slight pulse.  Edgar noticed
that large quantities of blood were spewing from Jerry’s mouth and nose.  Edgar
and other EMTs tried to treat and resuscitate Jerry; however, their efforts
failed.  Ultimately, Jerry was pronounced dead at the scene of the accident,
and, at his family’s request, Jerry’s body was immediately transferred to the
local funeral home.  No autopsy of Jerry’s body was conducted.

            Regarding the particulars of
the accident, Edgar stated that the collision between Jerry’s pickup truck and
the Kia was a “medium impact” that looked to him like “a glancing type shot.” 
Edgar opined that Laura’s sedan “pretty much T-boned [Jerry’s pickup truck] in
the center,” which apparently “just about folded the truck in half.”  When
asked what his opinion was regarding the cause of Jerry’s death, Edgar
testified that:

Based on the things that we’ve learned
as far as impact and what it does to the body inside, you have your different
collisions.  Of course, you’ve got the collision with whatever they hit.  Then
the body itself collides with the seat belts, steering wheel, air bags.  You’ve
got that collision.  Once it stops, you’ve also still got the motion of
internal organs and stuff that still impact the inner walls and chest cavity
and abdomen and whatnot.  With all that, there’s several different things that
could have been ruptured internally.  I cannot tell you exactly which one; but
liver, stomach, aortic shears, all your tendons and that that [sic] hold the
organs somewhat in place, when they get jarred like that, tear loose tissue
inside the body and can cause substantial internal bleeding.  So, with the
amount of blood that came from his mouth and nose, he definitely had lots of
internal bleeding.

 

Edgar also noted that he thought the
collision between Jerry’s pickup truck and Laura’s sedan was the only possible
collision that could have caused the injuries that Jerry sustained.  In
asserting this opinion, Edgar relied on his experience and training working at
accident sites and an undisclosed book apparently used in paramedic school.

            Edgar later admitted that he
is not a doctor and that doctors typically diagnose and determine which
injuries the patient has sustained.  Like Dr. Davies, Edgar was unable to
pinpoint the exact injuries that Jerry sustained.  In addition, Edgar could not
determine which of Jerry’s internal organs had caused the excessive bleeding
that Edgar observed.  Edgar acknowledged that an autopsy likely would have
yielded a more accurate portrayal of Jerry’s injuries.  He also acknowledged
that it was not his responsibility, but rather that of the Justice of the Peace
or the doctor conducting the autopsy, to determine the cause of Jerry’s death. 
Edgar testified that Jerry also had a puncture wound to his head and a spinal
injury, both of which could have caused his death.  In determining that Laura’s
sedan had caused the injuries that ultimately killed Jerry, Edgar did not take
any measurements at the scene of the accident, nor did he take any photographs
or do a detailed inspection of the vehicles.  He briefly examined the damage to
both vehicles and concluded that the collision with Laura’s sedan had killed
Jerry.  Edgar denied having any training in accident reconstruction or
biomechanical engineering.  He also denied ever having reviewed Deputy
Neumann’s police report chronicling the accident, though he disagreed with most
of the results of Deputy Neumann’s investigation.

            Appellants did not provide
any summary judgment evidence demonstrating that Edgar was qualified as an
accident reconstructionist so as to describe what actually occurred during an
accident which he did not personally observe.  Moreover, there is no evidence
demonstrating that Edgar, a non-physician expert, was qualified to opine about
the injuries Jerry sustained and that such injuries were only caused by the
impact between Jerry’s pickup truck and Laura’s sedan.  Furthermore, and
perhaps more importantly, Edgar does not provide any scientific studies or information
to support his bare assertions that the impact with Laura’s sedan is what
killed Jerry.  Essentially, there is no link between medical science and the
facts in this case.  See Ramirez, 159 S.W.3d at 906 (holding that an
expert’s “bare opinion” will not suffice and is unreliable if “based solely
upon his subjective interpretation of the facts”); see also Hughes, 306
S.W.3d at 239 (“Expert testimony is also unreliable if it is not grounded in
scientific methods and procedures, but rather is based upon subjective belief
or unsupported speculation.”).  On appeal, appellants attempt to argue that
Edgar was qualified to give his opinion about what impact and injuries killed
Jerry based on his experience alone.  However, Edgar testified that, during the
course of his career, he had only worked on four or five accidents that
resulted in fatalities and that he had not worked on a case involving multiple
impacts and the death or serious injury of one or more vehicle occupants.  

            Given our review of the
record, we do not believe that Edgar is qualified to opine on medical causation
or accident reconstruction.  See, e.g., Schronk v. City of Burleson, No.
10-07-00399-CV, 2009 Tex. App. LEXIS 5654, at *30 (Tex. App.—Waco July 22,
2009, pet. denied) (mem. op.) (“Because Dr. Reese is not a medical doctor and
because his affidavit and CV do not demonstrate any special experience in
determining medical causation, we cannot say the court abused its discretion by
determining that he is not qualified to render an expert opinion on cause of
death.”) (citing Methodist Health Ctr. v. Thomas, No. 14-07-00085-CV,
2007 Tex. App. LEXIS 6655, at **8-9 (Tex. App.—Houston [14th Dist.] 2007, no
pet.) (mem. op.); Marts ex rel. Marts v. Transp. Inc. Co., 111 S.W.3d
699, 703-04 (Tex. App.—Fort Worth 2003, pet. denied)); see also LMC Complete
Auto., Inc. v. Burke, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.]
2007, pet. denied) (“To constitute evidence of causation, a medical expert’s
opinion must rest in reasonable medical probability.”) (emphasis added) (citing
Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex. 1995); Myers,
411 S.W.2d at 713).[6] 
While we recognize that Edgar can testify as a lay witness as to what he
observed at the scene of the accident, he cannot testify as an expert as to
causation in this case.  We also recognize that, in some instances, a witness
can be considered an expert as to medical causation based on special
experience.  See Esquivel v. El Paso Healthcare Sys., 225 S.W.3d 83, 90
(Tex. App.—El Paso 2005, no pet.); see also Shaw v. Triple J Mowers, Inc.,
No. 10-04-00262-CV, 2006 Tex. App. LEXIS 1316, at **5-6 (Tex. App.—Waco Feb.
15, 2006, no pet.).  However, this exception does not apply in this case given
Edgar’s limited experience—four or five instances—with automobile accidents
involving fatalities and the dearth of evidence explaining precisely Edgar’s
involvement in such accidents and whether such accidents also involved multiple
impacts and multiple actors so as to provide this Court or the trial court with
a basis for concluding that Edgar’s experience meets this exception.  See
Esquivel, 225 S.W.3d at 90; see also Shaw, 2006 Tex. App. LEXIS
1316, at **5-6.

And, finally, even if he was qualified
to opine on such matters, the “bare opinion” Edgar gives in his deposition is
premised “solely upon his subjective interpretation of the facts,” which
renders his opinion unreliable.  See Ramirez, 159 S.W.3d at 906 (stating
that an expert’s reliance on the “laws of physics” does not provide a
sufficient basis for his opinion).  Therefore, based on the foregoing, we
conclude that the trial court did not abuse its discretion in striking the
expert testimony of Edgar.  See Sanchez, 997 S.W.2d at 590; Gammill,
972 S.W.2d at 718-19; see also Robinson, 923 S.W.2d at 558.

D.    Cope

With respect to Cope’s testimony, Judge
Robertson stated:

The Motion is granted.  I find that Cam
Cope’s opinions are both conclusory and subjective.  His opinions are not based
on sufficient physical evidence to be more than speculation.  Mr. Cope’s
credentials do not bridge the analytical gap between the scant available
evidence and the conclusions he has reached as to Defendant’s failure to stop
or stop earlier, failure to take proper evasive action, and the speed of any
vehicle.  His use of a computer program to generate results, does not cure the
lack of foundational information to generate reliable results.  Cope is not
qualified to give an expert opinion assigning cause of death to a particular
collision.  Even if he were qualified, there was insufficient data for him to
do so.  His opinions would be more confusing than helpful to the jury.

 

            In conducting his
investigation of the accident, Cope testified that he reviewed Deputy Neumann’s
accident report, photographs of the vehicles after the accident occurred, and
information sent by an unknown Bill Rosenbluth.  Cope also noted that he went
to the scene of the accident for observational purposes.  He did not, however,
take any measurements at the scene of the accident.  Cope explained that the
bridge had been replaced shortly after the accident transpired, though Cope
stated that the replacement of the bridge did not have anything to do with this
accident and that it had been previously scheduled.  Cope was requested to
provide Laura’s counsel with any handwritten notes or materials he relied upon
in arriving at his opinion; however, when prompted to do so, Cope did not have
his notes or calculations available, though he did offer to print them out from
the computer program he used.  Nonetheless, Cope testified that he took
information provided from the “black boxes” of Laura’s sedan and Jerry’s pickup
truck to determine the “delta-v,” or what was described as the change in speed
when the vehicles collided.  Rosenbluth’s examination of the black box in
Laura’s sedan yielded a twenty-seven to twenty-eight mile per hour “delta-v,”
which Cope argued, in a conclusory fashion, supported a finding that Laura was
traveling forty-five miles per hour at the time of impact.  Cope then changed
his testimony on two occasions to ratchet up Laura’s speed of travel.  On the
first occasion, Cope argued that Laura was traveling forty-five to fifty-five
miles per hour at the time of impact.  Next, he argued that Laura could have
been traveling sixty miles per hour.  Cope’s own calculations yielded a
“delta-v” that was forty to forty-five miles per hour, a figure that
contradicted that which was calculated based upon data obtained from the black
box of Laura’s sedan.  Cope did not have any explanation for the discrepancy;
however, on appeal, appellants argue that “common sense alone would tell even a
lay person that she [Laura] very likely was going about 45 m.p.h.”  Though he
did not explain the calculations made to arrive at his “delta-v” calculation,
Cope argued that he merely inputted information given to him into a computer
program, EDCRASH, which produced the challenged result.  In fact, Cope admitted
to not having done any calculations himself prior to arriving at his opinion. 
Cope, an accident reconstructionist, was unable to explain the calculations
necessary to arrive at the “delta-v,” and he admitted that he relied on the
initial deposition testimony given by Laura and Miguel even though material
portions of the desposition testimony had been changed with the trial court’s
approval.

            Cope also opined that
Jerry’s pickup truck was at rest or nearly at rest when the collision with
Laura’s sedan occurred.  Appellants argue that Cope used measurements from
AUTOCAD, another computer program used in accident reconstruction, scaled the
measurements to the pictures of the vehicles provided, including the actual
crash depths, and made his determination that the collision with Laura caused
Jerry’s death.  Appellants also argue that Laura’s objections to Cope’s testimony
go to the weight of the testimony, not its admissibility.  We disagree.

            The record demonstrates that
Cope arrived at a “delta-v” that varied wildly from that obtained from the
black box of Laura’s sedan and that Cope cannot explain why such a discrepancy
exists.  Moreover, Cope was repeatedly asked to explain how he arrived at his
opinion and what calculations were done; however, he was unable to adequately
explain his calculations or how he arrived at his conclusions.  Cope also
stated that Laura’s sedan collided with Jerry’s pickup truck on the passenger
side, though other eyewitnesses testified to the contrary.  Cope stated that
his analysis of the accident demonstrated that the Kia had in fact collided
with the driver’s side of Jerry’s pickup truck.  Cope also admitted that when
using the computer programs, he made a typographical error in inputting the
weight of Laura’s sedan, which distorted all of his calculations.  Cope, based
solely on the photographs and his own analysis of the accident, disagreed with
eyewitnesses who stated that Jerry’s pickup truck collided with the high curbs
of the bridge at least two different times.  Cope initially disagreed with
Deputy Neumann’s assessment that Jerry was likely driving too fast when he
encountered the bridge.  However, Cope later recanted and acknowledged that
Jerry entered “the bridge unsafely which resulted in his vehicle spinning out
of control.”  Cope testified that the Kia had minor damage, though other
witnesses, even Edgar, testified that the damage to the Kia was fairly
significant.[7] 
Cope assumed that the damage to the Kia was minor because none of the vehicle’s
occupants were seriously injured.  Later, Cope stated that:  “I’m assuming that
he [Jerry] died of a severe head trauma . . . as a result of impact.”  Cope
explained that, in determining the cause of Jerry’s death, he relied on an
autopsy report, which does not exist, and the testimony of other witnesses in
arriving at his conclusion about Jerry’s injuries.  Cope argued that Jerry’s
injuries were caused by Laura’s sedan because of “[t]he amount of intrusion
into the occupant compartment space by the Lexus.”  However, Cope denied having
examined Jerry’s body or having medical expertise to make such a conclusion. 
Finally, at the end of his deposition, Cope stated that his conclusion that
Laura caused Jerry’s death was based on a number of assumptions which, based on
our review of the record, were demonstrated to be faulty.

            The supreme court has held
that courts are not to decide whether an expert’s conclusions are correct, but
instead whether the analysis used to reach the conclusions is reliable.  Gammill,
972 S.W.2d at 728; see Hughes, 306 S.W.3d at 239.  And if they are based
on flawed methodology, then the conclusions are unreliable.  Gammill,
972 S.W.2d at 728; see Hughes, 306 S.W.3d at 239.  Here, Cope admitted
that his calculations vary wildly from information obtained from the black box
in Laura’s sedan, and he does not explain the variation or, in other words, he
failed to bridge the analytical gap between the facts and his conclusions.  See
Hughes, 306 S.W.3d at 239; see also Joiner, 522 U.S. at 146, 118 S.
Ct. at 518-19; Ledesma, 242 S.W.3d at 39; Gammill, 972 S.W.2d at
728.  In addition, much of Cope’s testimony is against the great weight of the
evidence contained in the record, especially the testimony of witnesses who
personally observed the accident.  See Hughes, 306 S.W.3d at 239
(“Reliability may be demonstrated by the connection of the expert’s theory to
the underlying facts and data in the case.”).  Cope acknowledges that many of
his calculations are premised on assumptions that were demonstrated to be
faulty.  Though Cope has extensive experience in accident reconstruction, there
exists too many analytical gaps between his opinions and the facts contained in
the record.  See Hughes, 306 S.W.3d at 239; see also Joiner, 522
U.S. at 146, 118 S. Ct. at 518-19; Ledesma, 242 S.W.3d at 39; Gammill,
972 S.W.2d at 728.  Furthermore, Cope did not demonstrate that he was qualified
to opine as to the cause of Jerry’s injuries; in fact, his determination of the
injury that killed Jerry varies from the determinations of Dr. Davies and
Edgar—that Jerry died from exsanguinations.  See, e.g., Schronk, 2009
Tex. App. LEXIS 5654, at *30 (citing Thomas, 2007 Tex. App. LEXIS 6655,
at **8-9; Marts, 111 S.W.3d at 703-04); see also Burke, 229
S.W.3d at 478 (citing Crye, 907 S.W.2d at 500; Myers, 411 S.W.2d
at 713).  Based on the foregoing, we conclude that Cope’s opinions are
unreliable and that the trial court did not abuse its discretion in striking
Cope’s testimony.  See Sanchez, 997 S.W.2d at 590; Gammill, 972
S.W.2d at 718-19; see also Robinson, 923 S.W.2d at 558.  Accordingly, we
overrule appellants’ second issue.

III. Appellant’s
Motion to Limit the Testimony 

of Appellee and Her Husband

 

            By their fourth issue,
appellants assert that the trial court erred in denying their motion to limit
the testimony of Laura and Miguel.  Essentially, appellants contend that the
trial court erred in allowing Laura and Miguel to make changes to their
deposition testimony after the twenty-day time frame outlined in Texas Rule of
Civil Procedure 203.1(b) had passed.  We disagree.

In their motion
to limit Laura and Miguel’s testimony, appellants essentially moved the trial
court to exclude evidence of changes made to Laura and Miguel’s deposition
testimony.  We review a trial court’s decision to admit or exclude evidence
under an abuse of discretion standard.  See City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995).  Texas Rule of Civil Procedure 203.1(b)
provides that a witness may change his or her responses as reflected in the
original deposition transcript by making changes on a separate sheet of paper
and indicating the reasons for making the changes.  Tex. R. Civ. P. 203.1(b).  Rule 203.1(b) further provides
that:

The witness must then sign the
transcript under oath and return it to the deposition officer.  If the witness
does not return the transcript to the deposition officer within 20 days of the
date the transcript was provided to the witness or the witness’s attorney, the
witness may be deemed to have waived the right to make the changes.

 

Id. (emphasis added).

            The inclusion of the term
“may” in rule 203.1(b) does not impose a mandatory duty on the trial court, but
rather indicates that the trial court has discretion in determining whether a
witness had waived his or her right to make changes to their deposition
testimony by failing to return the revised transcript to the deposition officer
within twenty days.  See id.; Tex.
Gov’t Code Ann. § 311.016(2) (West 2005) (providing that the term “shall
. . . imposes a duty”); see also United States v. Rodgers, 461 U.S. 677,
706, 103 S. Ct. 2132, 2149, 76 L. Ed. 2d 236 (1983) (“The word ‘may’ . . .
usually implies some degree of discretion.”); Ramsay v. Tex. Trading Co.,
Inc., 254 S.W.3d 620, 631 (Tex. App.—Texarkana 2008, pet. denied) (stating
that the term “may” is generally construed as permissive); In re J.L.W.,
919 S.W.2d 841, 842 (Tex. App.—El Paso 1996, no writ) (noting that the term
“shall” is generally construed to be mandatory, but it also may be construed as
directory).  Therefore, even though it is undisputed that appellees did not
return the revised deposition transcript to the deposition officer within the
twenty-day deadline, it was within the discretion of the trial court to accept
the changes or conclude that appellees waived the right to make the tendered
changes.  See Tex. R. Civ. P.
203.1(b); see also Rodgers, 461 U.S. at 706, 103 S. Ct. at 2149.

            In the present case, counsel
for appellants deposed Laura and Miguel on September 17, 2008.  The court
reporter forwarded Laura and Miguel’s deposition transcripts to defense counsel
on September 29, 2008, with a return date of October 20, 2008.  Laura and
Miguel made several substantive changes to their deposition testimony,
including testimony regarding how far and how long they traveled until they
took action to avoid Jerry’s oncoming pickup truck, via errata sheets in
compliance with rule 203.1.  See Tex.
R. Civ. P. 203.1.  The errata sheets were returned to the court reporter
on November 13, 2008.  Between the due date of October 20, 2008 and the date of
actual return, November 13, 2008, there does not appear to have been any
significant activity that transpired in this case.  It was not until two years
later, on November 17, 2010, that appellants complained about the timeliness of
the changes made to Laura and Miguel’s deposition testimony.[8]

            In arguing that the changes
were untimely, appellants cite to federal cases, which rely on Federal Rule of
Civil Procedure 30 regarding changes to deposition testimony—a rule that varies
significantly from Texas Rule of Civil Procedure 203.1.  See Fed. R. Civ. P. 30[9];
see also Reed v. Hernandez, 114 Fed. Appx. 609, 611 (5th Cir. 2004); Raytheon
Co. v. Indigo Sys. Corp., No. 4:07-cv-109, 2009 U.S. Dist. LEXIS 12558, at
**5-11 (E.D. Tex. Feb. 18, 2009).  In addition, appellants contend that, by
allowing Laura and Miguel to change their deposition testimony in an untimely
manner, other litigants would attempt to make eleventh hour changes to exact
harm and prejudice on opposing parties.  We are not persuaded by this argument
because the rule clearly vests discretion with the trial court to determine
whether such changes should be allowed.  Should it believe that a party’s
changes would inflict harm or prejudice on opposing parties, the trial court
has the discretion to conclude that such changes were waived.  See Tex. R. Civ. P. 203.1.  Finally,
appellants contend that Laura and Miguel should not have been allowed to change
their deposition testimony without providing an excuse for the delay or, in
other words, provide “good cause” for the delay.  Based on our reading of rule
203.1, we cannot agree with appellants’ insistence that Laura and Miguel were
duty-bound to provide an excuse to explain the delay.  See id.  To
endorse appellants’ argument would be to add language to rule 203.1(b) which
does not exist.  See id.  We decline to do so.

            Given that appellants waited
nearly two years to object to the timeliness of the changes and the record does
not demonstrate that appellants were harmed by the delay, we cannot say that
the trial court abused its discretion in concluding that Laura and Miguel did
not waive their right to change their deposition testimony and, thus, denying
appellants’ motion to limit the deposition testimony of Laura and Miguel.  See
Tex. R. Civ. P. 203.1(b); see
also Rodgers, 461 U.S. at 706, 103 S. Ct. at 2149.  Accordingly, we overrule
appellants’ fourth issue.

IV. Appellee’s
No-Evidence Motion for Summary Judgment

 

By their first
issue, appellants contend that the trial court erred in granting Laura’s
no-evidence motion for summary judgment because the deposition testimony of Dr.
Davies, Edgar, and Cope amounted to more than a scintilla of evidence to create
a material fact issue as to the causation element of their underlying cause of
action; therefore, the trial court was precluded from granting summary judgment
in favor of Laura.

We review a
trial court’s summary judgment de novo.  Provident Life & Accident Ins.
Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003).  A no-evidence motion for
summary judgment is essentially a motion for pretrial directed verdict, and we
apply the same legal sufficiency standard on review.  Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 581 (Tex. 2006); see also Humphrey v. Pelican
Isle Owners Ass’n, 238 S.W.3d 811, 813 (Tex. App.—Waco 2007, no pet.). 
Once such a motion is filed, the burden shifts to the non-moving party to present
evidence raising an issue of material fact as to the elements specified in the
motion.  See Tamez, 206 S.W.3d at 583; see also Tex. R. Civ. P. 166a(i) (providing that
the non-movant must provide “summary judgment evidence raising a genuine issue
of material fact”).  A genuine issue of material fact exists if more than a
scintilla of evidence establishing the existence of the challenged element is
produced.  King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex.
2003).  More than a scintilla of evidence exists when the evidence “’rises to a
level that would enable reasonable and fair-minded people to differ in their
conclusions.’”  Id. (quoting Havner, 953 S.W.2d at 711).  On the
other hand, evidence does not amount to more than a scintilla if it is “so weak
as to do no more than create a mere surmise or suspicion” of fact.  Chapman,
118 S.W.3d at 751; see Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63
(Tex. 1983).  In determining whether the non-movant has produced more than a
scintilla of evidence, we review the evidence in the light most favorable to
the non-movant, crediting such evidence if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not.  See Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004); see also Tamez,
206 S.W.3d at 582; City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005).

In the present
case, appellants have not provided any evidence as to the element of causation
besides the deposition testimony of Dr. Davies, Edgar, and Cope.  Because we
have previously concluded that the trial court did not abuse its discretion in
striking the testimony of Dr. Davies, Edgar, and Cope, and because appellants
have not proffered more than a scintilla of evidence creating a material fact
issue as to the element of causation, we cannot say that the trial court erred
in granting Laura’s no-evidence motion for summary judgment.  See Tex. R. Civ. P. 166a(i); Tamez,
206 S.W.3d at 581; Knott, 128 S.W.3d at 215; see also Humphrey,
238 S.W.3d at 813.  Accordingly, we overrule appellants’ first issue.

V.   
Appellee’s Motion to Sever

 

By their third
issue, appellants complain about the trial court’s severance order. 
Specifically, appellants contend that severance was not proper in this case
because State Farm did not make any offers to settle, nor did appellants make
any extra-contractual claims against State Farm; therefore, there is no
evidence of prejudice authorizing the trial court to sever appellants’ claims
against Laura from those against State Farm.

A separate trial
of any claim or issue may be ordered by the trial court in furtherance of
convenience or to avoid prejudice.  See Tex. R. Civ. P. 174(b); see also Guar. Fed. Sav. Bank v.
Horseshoe Operating Co., 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh’g). 
Under the rules of civil procedure, any claim against a party may be severed
and proceeded with separately.  Tex. R.
Civ. P. 41.  We review the trial court’s decision to grant appellees’
motion to sever for an abuse of discretion.  See Liberty Nat’l Fire Ins. Co.
v. Akin, 927 S.W.2d 627, 629 (Tex. 1996).  A claim is properly severable if
(1) the controversy involves more than one cause of action, (2) the severed
claim is one that would be the proper subject of a lawsuit if independently
asserted, and (3) the severed claim is not so interwoven with the remaining
action that they involve the same facts and issues.  See Guar. Fed. Sav.
Bank, 793 S.W.2d at 658; see also Tex.
R. Civ. P. 41 (providing that “actions which have been improperly joined
may be severed . . . on such terms as are just.  Any claim against a party may
be severed and proceeded with separately”).

The basis of
Laura’s severance motion was to prevent the injection of insurance into the
jury’s determination of liability and damages.  In their live pleading,
appellants contended that Laura was “operating an underinsured motor vehicle
(insured in only the amount of $50,000).”  The alleged underinsurance of
Laura’s vehicle appears to serve as the purpose for joining State Farm in this
lawsuit.  And, as noted earlier, appellants alleged that Laura was negligent in
operating her vehicle for a number of reasons.  Texas Rule of Evidence 411
provides that:

Evidence that a
person was or was not insured against liability is not admissible upon the
issue whether the person acted negligently or otherwise wrongfully.  This rule
does not require the exclusion of evidence of insurance against liability when
offered for another issue, such as proof of agency, ownership, or control, if
disputed, or bias or prejudice of a witness.

 

Tex. R. Evid. 411.  Because rule 411 precludes the
introduction of insurance upon the issue of whether a person acted negligently
or wrongfully and because evidence that Laura was underinsured was not offered
for the above-mentioned exceptions, it would appear that rule 411 would support
severance.  See id.  Furthermore, and perhaps most importantly, State
Farm was joined in this lawsuit because Laura was allegedly underinsured. 
Because we have concluded that the trial court did not err in granting summary
judgment, Laura is not liable to appellants.  As a result, the issue of
underinsurance is moot.  See Allstate Ins. Co. v. Hallman, 159 S.W.3d
640, 642 (Tex. 2005) (noting that a case becomes moots if a controversy no
longer exists or if the parties lack a legally cognizable interest in the
outcome).  Accordingly, we conclude that the trial court did not abuse its
discretion in severing appellants’ claims against Laura for convenience and to
avoid prejudice.  See Tex. R.
Civ. P. 174(b); see also Akin, 927 S.W.2d at 629; Guar. Fed.
Sav. Bank, 793 S.W.2d at 658.  We overrule appellants’ third issue.




 

VI.  Conclusion

 

Having overruled
all of appellants’ issues, we affirm the judgments of the trial court.

 

AL SCOGGINS

                                                                                    Justice

 

 

Before Chief
Justice Gray,

            Justice
Davis, and

            Justice
Scoggins

Affirmed

Opinion
delivered and filed August 3, 2011

[CV06]








 









[1]
State Farm Lloyd’s Inc. d/b/a State Farm Mutual Automobile Life Insurance
Company and/or d/b/a State Farm is not a party to this appeal.

 





[2] Appellants chose not to file suit
against Green; thus, she is not a party to this appeal.

 





[3] Appellants state that, at the time of
the accident, Jerry was “doing business as Longhorn Pest Control . . . .”  With
regard to the iciness of the bridge, the Justice of the Peace who arrived at
the scene after the accident had transpired noted that the roadway was so icy
that she could barely walk.

 





[4] Deputy Neumann responded to the
accident and mentioned in his report that he spoke with Laura’s husband,
Miguel, about the incident.  According to Deputy Neumann, Miguel described the
incident as follows:

 

I
[Deputy Neumann] contacted the passenger of VEH #3, CAMPOS, M, via telephone
while he was at the hospital.  He stated that they were NORTHBOUND
approximately 200 FEET behind VEH #2 (Green’s Kia) when they observed VEH #1
(Jerry’s pickup truck) enter the bridge SOUTHBOUND at a high rate of speed
“definitely too fast for conditions.”  VEH #1 began “fishtailing” and at one
point[,] struck the curb, causing the vehicle to skid towards VEH #2.  VEH #1
struck VEH #2 sliding broadside to it, VEH #2’s front left corner contacting
VEH #1 midway down the RIGHT side between the cab and bed of the truck.  VEH #2
then spun NORTHBOUND[,] and VEH #1 spun SOUTHBOUND towards VEH #3.  VEH #3 attempted
to slow and evade but was unable to due to lack of traction on the bridge.  VEH
#3 slid partially into the SOUTHBOUND lanes attempting to avoid impact, but VEH
#1, after completing at least one revolution following impact with VEH #2,
struck their vehicle sliding sideways with considerable force.  VEH #3
contacted VEH #1 in the same place as VEH #2 had in the first impact.





[5] The record reflects that Laura was also
insured by State Farm.





[6] To the extent that appellants argue
that Edgar’s testimony about causation should be allowed as a layperson’s
observations, we note that the supreme court has specifically stated that
“non-expert evidence alone is sufficient to support a finding of causation in
limited circumstances where both the occurrence and conditions complained of
are such that the general experience and common sense of laypersons are
sufficient to evaluate the conditions and whether they were probably caused by
the occurrence.”  Guevara v. Ferrer, 247 S.W.3d 662, 668-69 (Tex.
2007).  Specifically, the Guevara court noted that determining causation
of “certain types of pain, bone fractures, and similar basic conditions”
following an automobile accident was within the competence of lay jurors.  Id.
at 668.  This case is not a limited circumstance where Jerry’s injuries are
clearly attributable to one simple act by one actor thus obviating the need for
expert testimony.  Here, Jerry sustained multiple major injuries as a result of
multiple collisions with vehicles and inanimate objects.  In fact, none of
appellants’ experts could agree on the specific impact and the specific injury
that killed Jerry.  Given this, we cannot say that this incident is within the
general experience and common sense of laypersons to evaluate the conditions
and determine causation without the aid of expert testimony.  See id. at
668-69.





[7] Deputy Neumann rated the damage to the
Kia as a five on a scale between one and seven, with one representing minimal
damage and seven representing a total destruction of the vehicle.





[8] We also note that though Cope stated in
his deposition that he relied on Laura and Miguel’s initial deposition
testimony, Cope did not specify when he made his calculations or that he had
insufficient time to amend his calculations given the changes authorized by the
trial court.

 





[9] Federal Rule of Civil Procedure 30(e)
provides that:

 

Review;
Statement of Changes.  On request by the deponent or a party before the
deposition is completed, the deponent must be allowed 30 days after being
notified by the officer that the transcript or recording is available in which:

 

(A)  
To review the
transcript or recording; and

 

(B)   
If there are changes
in form or substance, to sign a statement listing the changes and the reasons
for making them.

 

Fed. R. Civ. P.
30(e).  Unlike Texas Rule of Civil Procedure 203.1(b), the plain language of
Federal Rule of Civil Procedure 30 does not afford the trial court with
discretion to accept or reject changes made to deposition testimony outside of
the specified time frame.  See id.; see also Tex. R. Civ. P. 203.1(b).